2015 IL App (1st) 140683

SIXTH DIVISION
September 30, 2015

No. 1-14-0683

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| MELINDA SCHWEIHS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHASE HOME FINANCE, LLC, successor | ) | |
| by merger to CHASE MANHATTAN | ) | No. 10 L 11302 |
| MORTGAGE COMPANY-WEST, | ) | |
| formerly known as | ) | |
| MELLON MORTGAGE COMPANY; | ) | |
| SAFEGUARD PROPERTIES, INC.; | ) | |
| TODD GONSALEZ; and EDILFONSO | ) | |
| CENTENO, | ) | |
| | ) | Honorable Daniel J. Lynch, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE DELORT delivered the judgment of the court, with opinion.
Justice Cunningham concurred in the judgment and opinion.
Justice Harris dissented, with opinion.

**OPINION**

¶ 1    Illinois courts hear many cases involving mortgage foreclosures. Almost all of those disputes involve whether the mortgage was properly foreclosed. This, however, is a tort case regarding a physical entry into the borrower's home which occurred before the foreclosure litigation was even over.

¶ 2    Plaintiff Melinda Schweihs filed a five-count complaint against Chase Home Finance, LLC (Chase), Safeguard Properties, Inc. (Safeguard), Todd Gonsalez, and Edilfonso Centeno,

alleging trespass, negligent trespass, private nuisance, intentional infliction of emotional distress, and negligence. After extensive discovery and pre-trial motion practice, the trial court (1) entered summary judgment in favor of defendants on Schweihs's claims for private nuisance and intentional infliction of emotional distress; (2) granted Schweihs leave to amend count V of her complaint; and (3) dismissed amended count V, which attempted to set forth a claim for negligent infliction of emotional distress. On appeal, Schweihs argues that (1) there existed genuine issues of material fact with respect to her claims for private nuisance and intentional infliction of emotional distress which should have precluded the entry of judgment against her; and (2) that the trial court erred in dismissing count V as amended because it properly stated a claim for negligent infliction of emotional distress. We disagree and affirm.

¶ 3                                              BACKGROUND

¶ 4       The events leading up the incident underlying this case began on March 6, 1997. On that day, Schweihs obtained a mortgage for a home located in Northbrook, Illinois.[1] As relevant to this case, the mortgage contained a clause granting Chase the right, in the event of a default by Schweihs, to enter onto the property to make repairs. The clause reads as follows:

> "7. Protection of Lender's rights in the Property. If Borrower fails
>
> to perform the covenants and agreements contained in this Security
>
> Instrument *** then Lender may do and pay for whatever is
>
> reasonable or appropriate to protect the value of the Property and
>
> Lender's rights in the Property. Lender's actions may include
>
> paying any sums secured by a lien which has priority over this
>
> Security Instrument, appearing in court, paying reasonable

---

[1]The note which accompanied the mortgage was transferred to Chase at some point in time.

> attorney's fees and entering on the Property to make repairs.
>
> Although Lender may take action under this paragraph 7, Lender
>
> does not have to do so."

¶ 5    Schweihs defaulted on the mortgage in 2007. As a result, on December 3, 2007, Chase filed a complaint to foreclose the mortgage against her. *Chase Home Finance v. Schweihs*, No. 07 CH 35360 (Cir. Ct. Cook County, IL) ("foreclosure case"). On May 25, 2010, the trial court entered a judgment of foreclosure against Schweihs. The court order permitted Schweihs to continue living at the property at least until her redemption period expired on August 25, 2010.

¶ 6    On June 17, 2010, Safeguard entered the fray. Safeguard is a company which provides preservation services for properties in foreclosure. Safeguard's employees do not personally perform property inspections or render preservation services. Instead, Safeguard employs "Client Account Representatives" (CAR) who coordinate with local vendors with whom Safeguard contracts. The local vendors, in turn, perform inspections and preservation services. On that day, Safeguard received a report from one of its vendors that Schweihs's property was vacant. In response, a Safeguard employee asked the vendor to explain his basis for reporting the property as vacant. The vendor replied, explaining:

> "The property looks like it belonged to a hoarder, there was never
>
> an answer anytime I have been at the property? This past
>
> inspection, the same thing happened, but I did notice that the gas
>
> meter is turned off, electricity and water are still?on [*sic*], and there
>
> is a dumpster in front of the property, indicating that someone is
>
> trying to clean property. I spoke to the neighbor to the left? and

[*sic*] across the street of property, and they also verified that they have seen people at property, but not fully occupied??"

¶ 7    Based on the vendor's report, a Safeguard CAR placed an "Initial Secure Order" with A1 Builders, a local contractor which performs property inspection services with whom Safeguard contracted. According to Jeff Marlowe, A1's Vice President, A1 in turn hired subcontractors who performed work orders. In June 2010, Gonsalez and Centeno worked as A1 subcontractors.

¶ 8    On June 22, 2010, at approximately 4 p.m., Gonsalez and Centeno arrived at Schweihs's property to execute the initial secure order. Gonsalez and Centeno were required to determine the vacancy status of the property before executing the order. They conducted a visual inspection of the property, observing that the grass on the property was uncut and the trees were overgrown. However, they also saw that there was a dumpster and a car parked on the driveway. Gonsalez knocked on the front door but did not receive an answer. He then checked the gas meter and water spout and determined that both utilities had been shut off.

¶ 9    The men also spoke to some neighbors. One neighbor told Gonsalez that Schweihs's property was unoccupied, but that a woman would occasionally visit. Gonsalez was also informed that random people occasionally used the driveway. However, Centeno was told by a neighbor that the car parked in the driveway belonged to the homeowner and that the "owner comes and goes." In all, Gonsalez and Centeno spent 45 to 90 minutes knocking on the door and gathering information from neighbors to determine if the house was occupied. Gonsalez also looked inside the home from the backyard and observed substantial debris, garbage, and boxes on the floor. Based upon this information, Gonsalez called Marlowe for permission to execute the work order, which Marlowe gave.

¶ 10    In order to gain entry into Schweihs's home, Gonsalez removed the door lock and

crawled through the doorway, because boxes and debris were piled up against it.  Unbeknownst to Gonsalez, Schweihs was inside when he entered the home.  When he got inside, Gonsalez saw Schweihs and said "lady, you scared the shit out of me."  Schweihs told Gonsalez to leave and said that she was calling her foreclosure lawyer.  Gonsalez told Schweihs that he was "from the mortgage company" and asked her to come to the front door to speak with him.  At that point, Schweihs called her foreclosure lawyer, and then the police.  The police arrived shortly thereafter.  After speaking with all parties involved, as well as neighbors, the police made no arrests.

¶ 11     Schweihs's account of what occurred differs from that of the defendants.  Schweihs testified she was at her home in her basement packing her belongings and talking on the telephone.  At some point, she thought she heard knocking on her door.  Rather than answer the door, however, she continued talking on the telephone.  After some time, Schweihs went upstairs to continue packing when she heard the noise of a metal mailbox "flap."  She looked outside from her second floor window and saw Gonsalez, Centeno, and a green truck in her driveway.  She thought that Gonsalez and Centeno were potential buyers because she was trying to sell her home during the redemption period.  Shortly thereafter, she heard noises coming from inside of the house.  When she went downstairs, she saw "a man in the family room and a man in the open doorway."  Schweihs asked Gonsalez and Centeno who they were and what they were doing in her house.  According to her, "one of them" told her in a "forceful" way that Chase sent them to winterize the house and that she needed to come outside to talk to them.  Schweihs refused to leave and instead told the men that she was going to call her lawyer and the police, which she in fact did after Gonsalez and Centeno went outside.  Shortly thereafter, five or six police officers arrived and told Schweihs that Gonsalez and Centeno were from Safeguard, and that they were at

her property related to Schweihs's foreclosure.

¶ 12    After the incident, Schweihs was afraid while in her home, fearful that she may be attacked.  On the same day as the incident, she drove to the hospital because she "didn't feel right."  Subsequently, she sought psychological treatment and medications from multiple doctors for issues with sleeping, anxiety, and depression.  Additionally, she alleged that she sought temporary leave from her employment due to the incident, but that her request was denied and she was instead terminated.

¶ 13    On October 4, 2010, Schweihs filed a five-count complaint against Chase, Safeguard, Gonsalez, and Centeno, alleging trespass, negligent trespass, private nuisance, intentional infliction of emotional distress, and negligence.  Extensive discovery ensued, and on October 23, 2013, the case was set for trial on January 22, 2014.  On November 13, 2013, Safeguard, Gonsalez, and Centeno filed a motion for summary judgment with respect to each of plaintiff's claims.  On December 11, 2014, Chase informed the court that it intended to file its own motion for summary judgment.  The court continued the trial date to February 4, 2014, and on December 18, 2013, Chase filed its motion for summary judgment with respect to each of plaintiff's claims.

¶ 14    On February 4, 2014, the trial court heard argument on defendants' motions.  During the hearing, plaintiff's counsel made clear that plaintiff's theory of recovery with respect to count V was that (1) Chase was negligent in the manner in which it hired and supervised Safeguard and (2) Safeguard was negligent in the manner in which it trained Gonsalez and Centeno to ascertain whether property was occupied before completing a work order.

¶ 15    The same day, plaintiff filed a motion for leave to amend her complaint.  Plaintiff's amended complaint altered count V in an effort to state a claim for negligent infliction of emotional distress.  As amended, count V alleged that defendants had a "duty to use reasonable

care in the training process of its employees, agents and contractors." Schweihs alleged that Chase breached that duty by "failing to properly train its employees, agents and contractors how to determine whether a property is abandoned and how to proceed when they are uncertain as to whether a property is abandoned." In addition, she alleged that defendants had a "duty to use reasonable care to not interfere with [her] right and interest in the private use and enjoyment of her home." Schweihs alleged that defendants breached that duty by, *inter alia*, determining that her home was vacant and "negligently carrying out the 'initial secure' work order even though it was clear that the property was neither vacant nor abandoned."

¶ 16    On February 6, 2014, the trial court granted defendants' motion for summary judgment with respect to Schweihs's claims for private nuisance and intentional infliction of emotional distress. The court denied defendants' motions with respect to the claims for trespass and negligent trespass. The court also granted Schweihs's motion for leave to amend her complaint. The court then dismissed count V as amended on the basis that "the relief requested by Plaintiff is unavailable as a matter of law based on the facts alleged." Finally, the court made a finding pursuant to Illinois Supreme Court Rule 304(a) that there was "no just reason for delaying *** appeal." Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). On March 5, 2014, Schweihs filed a notice of appeal. Accordingly, we have jurisdiction over Schweihs's appeal pursuant to Rule 304(a). See *Toushin v. Ruggiero*, 2015 IL App (1st) 143151, ¶ 5.

¶ 17    On appeal, Schweihs contends that the trial court erred by granting summary judgment in favor of defendants because there were genuine issues of material fact as to whether: (1) Gonsalez and Centeno's entry into her home was an unreasonable and substantial invasion of her use and enjoyment of her home; and (2) whether Gonsalez and Centeno's entry into her home had a high probability of causing severe emotional distress. In addition, Schweihs argues that

the trial court erred by dismissing her amended claim for negligent infliction of emotional distress.

¶ 18                                          ANALYSIS

¶ 19     We first consider whether the trial court erred by dismissing Schweihs's claim for negligent infliction of emotional distress pursuant to section 2-615 of the Code of Civil Procedure.  735 ILCS 5/2-615 (West 2010).  "A section 2-615 motion to dismiss tests the legal sufficiency of a complaint."  *Hadley v. Doe*, 2015 IL 118000, ¶ 29.  The central issue presented by 2-615 motion is "whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, state sufficient facts to establish a cause of action upon which relief may be granted."  *Id.*

¶ 20     In Illinois, there are two types of plaintiffs who may bring claims for negligent infliction of emotional distress: (1) bystanders and (2) direct victims.  A bystander is someone who observes an accident which results in an injury to a direct victim.  See *Lewis v. Westinghouse Electric Corp.*, 139 Ill. App. 3d 634, 639 (1985) (Linn, J., dissenting).  A direct victim, by contrast, is someone who suffers harm as a direct consequence of someone's negligence.  See *id*. ("The direct victim *** is the driver of the car involved in a collision; the pedestrian hit by a passing vehicle; the product user in whose hands the product explodes, or, as in the present case, the person trapped inside the malfunctioning elevator. The direct victim, in other words, is an actual participant in the accident itself.").[2]  Illinois courts have consistently held that, in order to be considered a direct victim, the victim must come into actual physical contact with the defendant and suffer a physical injury as a result.  See *Corgan v. Muehling*, 143 Ill. 2d 296, 304 (1991) (preserving "impact rule" with respect to direct victim plaintiffs); *Hayes v. Illinois Power*

_____

[2]The *Corgan* court cited portions of Justice Linn's dissenting opinion with approval.  See *Corgan v. Muehling*, 143 Ill. 2d 296, 305-306 (1991).

*Co.*, 225 Ill. App. 3d 819, 821, 825 (1992) (holding that plaintiff was direct victim where he touched his grandfather's body as it was being electrocuted, resulting in severe burns and shock to the nervous system); *Leonard v. Kurtz*, 234 Ill. App. 3d 553, 557 (1992) (plaintiff's whose deceased husband was negligently cremated was not a direct victim because "[t]here was no direct contact between the plaintiff and defendants"). A plaintiff who meets neither of these definitions cannot, as a threshold matter, state a claim for negligent infliction of emotional distress.

¶ 21 For claims brought by a bystander, to survive a motion to dismiss, the plaintiff must allege that (1) she was a bystander in the "zone of physical danger," *i.e.*, that she was in such close proximity to an accident which injured the direct victim that there was a high risk of injury to the plaintiff and (2) she suffered physical injury or illness as a result of the mental distress experienced due to the defendant's negligence. See *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546, 555 (1983). On the other hand, for claims brought by direct victims, to survive a motion to dismiss the plaintiff must allege facts showing that the defendant (1) owed the plaintiff a duty of care; (2) breached that duty; (3) caused an injury to the plaintiff which was proximately caused by the breach. *Corgan*, 143 Ill. 2d at 306.

¶ 22 In the present case, plaintiff concedes that she was not a bystander. Therefore, plaintiff's claim can survive dismissal only if she has alleges facts showing that she was a direct victim of defendants' alleged negligence. As we have explained, in order to do that, plaintiff must allege, at a minimum, that there was some physical contact between her and defendants. Far from alleging any such contact, however, Schweihs's amended complaint alleges only that Gonsalez and Centeno entered her home and, upon discovering her, asked her to step outside. Because Schweihs's amended complaint does not allege that defendants made physical contact with her,

she has failed to plead facts sufficient to establish that she was a direct victim. And, because

Schweihs failed to allege facts establishing that she was either a bystander or direct victim, her

claim for negligent infliction of emotional distress necessarily fails.

¶ 23    In an effort to salvage her claim, plaintiff argues that the supreme court in *Corgan*

abandoned the impact rule for both bystander and direct victim plaintiffs alike. In fact, the court

held precisely the opposite. In *Corgan*, the defendant argued that the supreme court "abandoned

the impact rule in *Rickey* and adopted the zone-of-physical-danger rule as the standard under

which all plaintiffs can recover for negligent infliction of emotional distress."[3] *Id*. The court

flatly rejected that argument:

> "Defendant's contentions are, however, misplaced.
>
> Although use of the word 'substitute' implies replacement of the
>
> *impact* rule with the *zone-of-physical-danger* rule, a closer reading
>
> of *Rickey* reveals that such a substitution was intended only in
>
> bystander cases. As one court explained: 'The facts of *Rickey* are
>
> those of a typical bystander case and the court uses the word
>
> "bystander" throughout the opinion. In particular, the court
>
> expressly puts the issue and the holding in the context of bystander
>
> recovery.' (*McAdams v. Eli Lilly & Co.* (N.D. Ill. 1986), 638 F.
>
> Supp. 1173, 1177.) *Rickey*, therefore, abandoned the impact rule as
>
> it applied to bystanders and adopted the zone-of-physical-danger
>
> rule as the standard under which they can recover damages for

---

[3]The court was referring to *Rickey v. Chicago Transit Authority*, 98 Ill. 2d 546 (1983). In that case, the Illinois Supreme Court abrogated the impact rule in negligent infliction of emotional distress cases involving bystander plaintiffs and replaced it with the zone-of-physical-danger rule. *Rickey*, 98 Ill. 2d at 555.

> negligent infliction of emotional distress. *Rickey* did not, however, define the scope of negligent infliction of emotional distress as it applies to direct victims. The court in *Rickey* was solely concerned with defining the parameters of *bystander* recovery." (Emphasis in original.) *Id.* at 304.

As the quoted passage indicates, the court in *Rickey* abrogated the impact rule only with respect to *bystander* plaintiffs. Accordingly, we reject plaintiff's reading of *Corgan*.

¶ 24 Plaintiff also cites *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337 (1995) in support of her position. True, in that case, the court stated that *Corgan* "eliminated the contemporaneous injury or impact requirement for a direct victim's recovery for emotional distress on a theory of negligence." *Id*. at 346. But for three reasons, we seriously doubt that this isolated statement from *Pasquale* has any controlling effect on this case. First, *Pasquale* was a bystander case, not a direct victim case, as reflected by the court's issue statement: "we confine our inquiry to whether the elimination of the contemporaneous injury or impact requirement for bystander recovery for emotional distress in the area of negligence meaningfully translates into an elimination of the element of physical harm for a bystander's recovery for emotional distress under strict liability theory." *Id*. at 347.

¶ 25 Second, the quoted language is *obiter dictum* because it is was not essential to the court's decision (*Id.* at 346 ("The rule plaintiff challenges is the requirement of a 'physical harm' for recovery under strict liability [citation]; his status as either a direct victim or bystander is immaterial to that broad challenge.")), and *obiter dictum* is not binding authority (*People v. Coleman*, 2015 IL App (4th) 140730, ¶ 56). Third, the court's statement in *Pasquale* is so inconsistent with *Corgan* that it can be considered nothing less than an overruling of *Corgan*.

Yet, the court's discussion of *Corgan* did not include any reference to *stare decisis* or any other acknowledgment that the court was departing from settled precedent. That silence is noteworthy, for in at least one other case nominally involving the same tort at issue here in which the supreme court overruled a prior decision, the court discussed principles of *stare decisis* and expressly acknowledged that it was reversing a prior precedent. See *Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶¶ 102-03, 113 (overruling *Siemieniec v. Lutheran General Hospital,* 117 Ill. 2d 230 (1987)). We thus decline to find *Pasquale* controlling here and affirm the dismissal of Schweihs's claim for negligent infliction of emotional distress.

¶ 26    We next consider whether the trial court properly entered summary judgment in favor of defendants on plaintiff's claims for intentional infliction of emotional distress and private nuisance. Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). Summary judgment is a drastic measure and should only be granted when the moving party's right to judgment is "clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill. 2d 90, 102 (1992). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Williams v. Manchester,* 228 Ill. 2d 404, 417 (2008). "Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied." *Outboard Marine Corp.*, 154 Ill. 2d at 102. We review a trial court's entry of summary judgment *de novo*. *Virginia Surety Co. v. Northern Insurance Co. of New York,* 224 Ill. 2d 550, 556 (2007).

¶ 27    To state a claim for intentional infliction of emotional distress, a plaintiff must allege that (1) the defendant engaged in conduct that was "extreme and outrageous"; (2) the defendant intended to inflict severe emotional distress or knew that there was a "high probability" that his conduct would cause the plaintiff to experience severe emotional distress; and (3) the defendant's "conduct must in fact cause *severe* emotional distress." (Emphasis in original.) *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988). "[T]he tort does not extend to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Id*. (quoting Restatement (Second) of Torts § 46, cmt. *d*, at 73 (1965)). Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community. *Id*.

¶ 28    Schweihs argues that summary judgment was not proper because a reasonable juror could have found that Gonsalez and Centeno knew that entry into her home created a high probability that she would suffer severe emotional distress. She additionally contends that Chase engaged in reckless conduct by allegedly circumventing the Illinois foreclosure law by failing to obtain a court order before hiring Safeguard, which in turn hired A1 Builders to perform inspection services on her property. Schweihs argues that it was plain to Gonsalez and Centeno that she was inside of her home, and that they disregarded a high probability that entry into her home would cause severe emotional distress.

¶ 29    In support of her argument, Schweihs contends that sections 15-1603 and 15-1701 of the Illinois Mortgage Foreclosure Law, (735 ILCS 5/15-1603, 15-1701 (West 2010)), which relate to redemption and right to possession, prohibited defendants from taking possession of her home during the redemption period without a specific court order finding that Schweihs had abandoned

the property. She asserts that because defendants had no such court order, their execution of the initial secure order was improper.

¶ 30    A proper understanding of the foreclosure law illustrates why this argument is incorrect. The first cited provision simply allows a court to shorten the redemption period if the court finds that the property has been abandoned. See 735 ILCS 5/15-1603(b)(4) (West 2010). The second does not mention abandoned property at all. It establishes a timeline along which different standards and presumptions apply as to a mortgagee's right to possession vis-à-vis the borrower, an issue which is particularly relevant in cases of receivership. 735 ILCS 5/15-1701 (West 2010).

¶ 31    "A common idiom describes property as a 'bundle of sticks'– a collection of individual rights which, in certain combinations, constitute property. [Citations.] State law determines only which sticks are in a person's bundle." *United States v. Craft*, 535 U.S. 274, 278 (2002). There is a huge difference between the right to possession for residential purposes which these statutes address, and the right to merely enter to make repairs. The former involves a lion's share of the "bundle of sticks," and the latter, only a tiny portion. The cited sections of the foreclosure law merely move a few of the sticks around from one party to another; neither absolutely prohibits any lender entry to secure the property or make repairs during the redemption period as Schweihs contends.

¶ 32    In fact, the judgment of foreclosure and sale order stated that "[i]n order to protect and preserve the mortgaged real estate, it has or may also become necessary for [Chase] to pay fire and other hazard insurance premiums on the real estate or to make such repairs to the real estate as may reasonably be deemed necessary for the proper preservation thereof." Even if the foreclosure law sections somehow did apply, the order itself gave Chase the right to enter onto

the property to make reasonable repairs for the preservation of the property. And in any event, Schweihs, by signing the mortgage, had presumptive knowledge of the clause which expressly stated that Chase could enter onto her property to make repairs if she fell into default. See *Asset Exchange II, LLC v. First Choice Bank*, 2011 IL App (1st) 103718, ¶ 43 (" 'One is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement. [Citation.] And the law is that a party who signs an instrument relying upon representations as to its contents when he has had an opportunity to ascertain the truth by reading the instrument and has not availed himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations.' " (quoting *Leon v. Max E. Miller & Sons, Inc.*, 23 Ill. App. 3d 694, 699-700 (1974))).

¶ 33     Even if we were to find some merit in the foreclosure law argument, we do not believe that, based on these facts, that a reasonable juror could find that defendants' conduct was "extreme and outrageous." Schweihs saw Gonsalez and Centeno in her driveway. She was packing her belongings while Gonsalez was knocking on the door. Crucially, Schweihs testified that she thought she heard knocking on the door, as well as the sound of her mailbox flapping, but that she continued talking on the telephone. Moreover, Schweihs was aware that she was in the redemption period, and even testified that she thought Gonsalez and Centeno could have been potential buyers, because she was trying to sell the house.

¶ 34     Despite these facts, Schweihs argues that the mere entry into her alone was in and of itself extreme and outrageous. Besides that entry, the only other evidence that she relies on to demonstrate that Gonsalez's and Centeno's conduct was extreme and outrageous is that Gonsalez was "forceful" when he asked that she come to the front door to speak with him. In the absence

of authoritative precedents so holding, we must decline to accept Schweihs's invitation to find that the entering of her home under these facts was extreme and outrageous *per se*.

¶ 35    The record shows that Gonsalez and Centeno conducted an investigation to determine whether the home was occupied.  Gonsalez checked the utilities, spoke with neighbors, and looked inside the home to see if it was occupied.  While there were signs that the house was not fully abandoned, such as the presence of the dumpster and a vehicle, Gonsalez inquired as to the nature of the vehicle and was told that many different people were parking in the driveway.

¶ 36    Next, Schweihs fails to cite any authority for her argument that the entry of her home alone was sufficient by itself to amount to extreme and outrageous behavior.  The interaction between Gonsalez, Centeno, and Schweihs was hardly extreme or outrageous.  Gonsalez stated his purpose for being at Schweihs's home, retreated back outside when he was surprised to see Schweihs, and then asked Schweihs to come to the door and speak to him.  And as noted above, Schweihs's own behavior does not support her claim.  She testified that she knew she was in the redemption period, that she heard knocking on her door and the sound of her mailbox flapping and called her foreclosure lawyer before calling the police.

¶ 37    While we acknowledge that sanctity of the home and inherent right to be free from intrusion are bedrock principles of the law, the facts do not support Schweihs's argument that she was completely unaware that a third party might enter her property at the time in question.  In fact, the record strongly suggests that she may have facilitated her own victimization.  Examples of this are that she refused to answer incessant knocking on her door and that rather than call the police first, she called her foreclosure attorney.

¶ 38    In so holding, we do not intend in any way to comment on whether defendants' conduct amounted to a trespass.  Trespass is a different tort with different elements, and that claim is still

pending in the trial court, which found there were issues of material fact preventing judgment on it. We merely conclude that based upon the facts adduced in this record, no reasonable juror could find that defendants' conduct was extreme or outrageous. Thus, summary judgment in favor of defendants on Schweihs's claim for intentional infliction of emotional distress was proper.

¶ 39     Finally, Schweihs argues that the trial court erred in granting summary judgment in favor of defendants on her claim for private nuisance. Schweihs challenges the trial court's determination that she could not demonstrate a substantial invasion of her property, and that Gonsalez and Centeno's entry into her home was not the type of invasion that the tort to which private nuisance relates.

¶ 40     "To constitute a private nuisance, it must be shown that the act complained of invaded another's interest in the use and enjoyment of his land. The invasion must be substantial, be either intentional or negligent, and be unreasonable." *Statler v. Catalano*, 167 Ill. App. 3d 397, 403 (1988). "The standard for determining if particular conduct is unreasonable is determined by the effect it would have on a normal person of ordinary habits and sensibilities." *Id.* The Illinois Supreme Court has "repeatedly described a nuisance as 'something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable.' " *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 205 (1997) (quoting *Rosehill Cemetery Co. v. City of Chicago,* 352 Ill. 11, 30 (1933)). Typical examples of invasions which have been held to constitute a private nuisance include noise, smoke, vibration, dust, fumes, and odors produced on the defendant's land and impairing the use and enjoyment of neighboring land. *Id.* at 205-06. Whether the complained-of activity constitutes a nuisance is generally a question of fact. *City of*

*Chicago v. Festival Theatre Corp.,* 91 Ill. 2d 295, 311 (1982); *Dobbs v. Wiggins*, 401 Ill. App. 3d 367, 376 (2010).

¶ 41    Schweihs argues that defendants' one-time entry onto her property was a private nuisance because an objectively reasonable person would find defendants' "unlawful break-in" of her home as an unreasonable and substantial invasion of the use and enjoyment of her home. Stated another way, she argues that an alleged trespass on her property is sufficient to be a private nuisance.

¶ 42    We cannot accept Schweihs's premise because it would elevate any alleged trespass to the status of a private nuisance. The conduct here is wholly unrelated to the tort of private nuisance, because the crux of the tort of private nuisance is to remedy wrongful behavior that *substantially* interferes with the use and enjoyment of one's property. The conduct here is far removed from that presented in classic nuisance cases, such as pollution or noise of a perpetual or ongoing nature. Schweihs's argument not only distorts the meaning of a private nuisance, but equates any singular *de minimis* encroachment or trespass into a private nuisance. Accordingly, the trial court properly granted summary judgment in favor of defendants on Schweihs's claim for private nuisance.

¶ 43    We need not address Schweihs's argument regarding an agency relationship between Chase, Safeguard, Gonsalez, and Centeno, because regardless of the existence or lack of the existence of an agency relationship, her claims would still fail as to all defendants.

¶ 44    Our conclusion is by no means an endorsement of how Chase and/or its hired contractors conducted themselves with regard to Schweihs's property. We recognize that many foreclosure defendants destroy the interior of their homes before leaving merely to spite their lenders, so it is not surprising that a major lender like Chase would have procedures in place to secure properties

against such conduct. See, *e.g.*, Michael M. Phillips, *Buyers' Revenge: Trash the House After Foreclosure*, Wall St. J., at A1 (Mar. 28, 2008), *available at* http://www.wsj.com/articles/SB129665586676656988. However, Schweihs was hardly someone who walked away from her property. She had appeared in her pending foreclosure case through counsel and was defending it. That alone suggests that the property was not so definitively abandoned as to require a break-in. It also supports our feeling that a simple old-fashioned telephone call between the attorneys representing the two sides was in order before anyone directed a work crew to break into plaintiff's home, if merely to verify the current status of her residency.

¶ 45                                CONCLUSION

¶ 46    Accordingly, we affirm the judgment of the Circuit Court of Cook County.

¶ 47    Affirmed.

¶ 48    JUSTICE HARRIS, dissenting.

¶ 49    I respectfully dissent.

¶ 50    The majority erroneously interprets the *Corgan* case to conclude, "we continue to recognize the necessity of a physical impact for a direct victim of negligent infliction of emotional distress." This is contrary to *Corgan*, which makes clear that the *Rickey* zone of danger test, or the necessity of a physical impact, does not apply where the plaintiff is a direct victim as we have here.

¶ 51    In *Corgan*, the plaintiff was a direct victim who filed an action for negligent infliction of emotional distress against her psychologist for allegedly engaging in sexual relations with her as part of or during her course of treatment. *Corgan*, 143 Ill. 2d at 300. Our supreme court specifically found that *Rickey* did not "define the scope of negligent infliction of emotional

distress as it applies to direct victims." *Id*. at 304. It held that the *Rickey* zone of danger test "does not apply to the instant case, as the plaintiff was a direct victim and not a bystander." *Id*. at 306. Our supreme court found that it "ha[d] yet to determine the pleading requirements for a plaintiff who has directly suffered emotional distress due to" negligence. *Id*. It concluded that the relevant question in a direct victim case "is whether the plaintiff properly alleged negligence on the part of the defendant." *Id*.

¶ 52 Our supreme court then addressed whether the complaint should be dismissed because the plaintiff did not allege she suffered a physical injury or illness as a result of her emotional distress. It acknowledged the difficulties of proving emotional distress without bodily harm, and the concerns about a plaintiff's trustworthiness in making such claims. *Id*. at 309. However, the court concluded that "lack of precision is not a justifiable reason to preclude recovery, as expert witnesses such as psychiatrists, psychologists and social workers are fully capable of providing the jury with an analysis of a plaintiff's emotional injuries. The emotional distress of the primary response is no less real than the distress that is coupled with the physical manifestation of the secondary response and should not be distinguishable at law." *Id*. at 311. The majority is wrong in continuing to require physical impact in claims for negligent infliction of emotional distress where plaintiff is a direct victim.

¶ 53 As our supreme court held in *Corgan*, "[t]he essential question [in a direct victim case] is whether the plaintiff properly alleged negligence on the part of the defendant." *Id*. at 306. A complaint for negligence must allege facts that establish the existence of a duty owed by defendant, a breach of that duty, and an injury suffered by plaintiff as a result of the breach. *Id*. In ruling on a section 2-615 motion to dismiss, all well-pled facts in plaintiff's complaint must be taken as true, as well as all reasonable inferences that can be drawn therefrom. *Neppl v. Murphy*,

316 Ill. App. 3d 581, 584 (2000). Here, plaintiff alleged in her complaint that defendant had a duty to use reasonable care in the hiring process, it breached this duty by hiring individuals who unlawfully entered her home, and plaintiff suffered injuries such as "lingering trauma, anxiety, depression and severe sleep impairment" as a proximate result of defendant's breach. The facts alleged, if proved, sufficiently establish the elements of plaintiff's negligent infliction of emotional distress claim.

¶ 54 The authority of our supreme court's *Corgan* opinion requires a reversal of the trial court's dismissal of plaintiff's claim for negligent infliction of emotional distress.