2024 IL App (1st) 230358-U

SECOND DIVISION
March 29, 2024

No. 1-23-0358

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| REVEREND PATRICIA A. CAREY and RICHARD FRY, | ) ) ) | Appeal from the Circuit Court Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 17 CH 12201 |
| THE 400 CONDOMINIUM ASSOCIATION, an Illinois Not-For-Profit Corporation, and HELEN DRESS, | ) ) ) ) | Honorable Thaddeus L. Wilson, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Summary judgment for defendants was proper in action for breach of fiduciary duty against condominium association, and private nuisance against a neighbor, based on an alleged smoke infiltration emanating from the neighbor's unit. The building's Rules and Regulations specifically permitted smoking in the condo building, and plaintiffs provided no evidence that any smoke that allegedly infiltrated their unit was unreasonable.

¶ 2    Plaintiffs, Reverend Patricia Carey and her husband, Richard Fry, own a condominium in a building which explicitly permits smoking within units of the building, so long as the smoking

"does not create a nuisance or unreasonable disturbance to others." Plaintiffs brought this action against their condominium association, the 400 Condominium Association ("Association"), and the owner of an adjacent unit, Helen Dress. They allege that the Association breached its fiduciary duties to plaintiffs by mishandling their complaints that secondhand tobacco and marijuana smoke infiltrated plaintiffs' unit from Dress's unit, and that Dress's actions in allowing the smoke to infiltrate plaintiffs' unit constituted a private nuisance. On summary judgment, the trial court found that plaintiffs had presented no evidence that any objectively unreasonable level of smoke had infiltrated their unit, and granted summary judgment for the Association and Dress. In this appeal, plaintiffs challenge the circuit court's rulings granting summary judgment in favor of defendants. They ask this court to instead find that summary judgment should be granted in their favor.

¶ 3     The record shows that plaintiffs own Unit 3701 in a condominium building located at 400 East Randolph Street, Chicago, IL, while Dress owns the adjacent Unit 3703. The Association and its Board of Directors operate and manage the building, and engage a property management company, The Habitat Company, for day-to-day building management.

¶ 4     The Association has established certain Rules and Regulations governing residency in the building.  As relevant here, Section 27 of those Rules and Regulations provides:

> "No unlawful, noxious or offensive activities shall be carried on in any Unit or elsewhere at the Building, nor shall anything be done therein or thereon which shall constitute a nuisance or which shall, in the judgment of the Board cause unreasonable noise, danger or disturbance to others.
>
> Residents and Unit Owners must not permit or participate in activities in the Units or Common Elements that will unreasonably disturb or interfere with the rights and comfort of other residents or Unit Owners."

¶ 5 Section 42, entitled "Smoking in Common Element Area and in Uinits [*sic*]" provides that smoking is not permitted in common areas of the building, and is "permitted only in Units, and only if it does not create a nuisance or unreasonable disturbance to others." The rules further provide that if "in-unit smoking result[s] in a nuisance or unreasonable disturbance to others, it will be the responsibility of the smoker to cure the issue within their unit."

¶ 6 Plaintiffs filed their initial complaint in this matter on September 8, 2017, and amended the complaint twice thereafter. Plaintiffs' second amended complaint, which is the subject of this appeal, was filed on December 19, 2019, and alleged two claims—breach of fiduciary duty against the Association, and private nuisance against Dress.

¶ 7 In general, plaintiffs alleged that, "[o]n information and belief, house guests and others visiting Dress's Unit smoke tobacco and/or marijuana inside the Unit, including on the balcony" and that "[s]moking within [Dress's] Unit *** causes the infiltration of secondhand and thirdhand marijuana and tobacco smoke into [p]laintiffs' Unit." Plaintiffs further alleged "[o]n information and belief," that "other owners and occupants" in the building also "smoke[d] marijuana and/or tobacco within their Units" and that smoke had "entered the common areas" of the building. Plaintiffs contended that the "infiltration of secondhand and thirdhand marijuana and/or tobacco smoke from other Units into [p]laintiffs' Unit" and into the "common areas" of the building constituted a nuisance under the Association's Rules and Regulations.

¶ 8 Plaintiffs also asserted that they had "met with and reported to the Association and its Board the infiltration of secondhand and thirdhand marijuana and tobacco smoke entering their Unit and the common areas," but that the Association had "refused to take any action" with regard to plaintiffs' complaints, "including investigating, and requesting the nuisance cease, holding hearings, levying fines or taking other action."

¶ 9    In their claim against the Association, plaintiffs alleged that the Association breached its fiduciary duties to plaintiffs by "permitting the continual infiltration of secondhand and thirdhand marijuana and tobacco smoke to [p]laintiffs' Unit" and to the "common areas" of the building. Additionally, plaintiffs contended that the Association breached its fiduciary duties to plaintiffs by "continually ignoring [p]laintiffs' repeated reports, *** failing to enforce the Rules and Regulations prohibiting nuisances, [and] *** failing to require smokers who create a nuisance or unreasonable disturbance within the building to cure the nuisance by the levying of fines and penalties or taking other action within their authority."

¶ 10    Regarding their "private nuisance" claim against Dress, plaintiffs alleged that Dress intentionally and unlawfully interfered with plaintiffs' "full enjoyment of their Unit and common areas" by "[s]moking and permitting the smoking of marijuana and tobacco in her Unit"; "permitting the continuing infiltration of secondhand and thirdhand marijuana and tobacco smoke from her Unit to [p]laintiffs' Unit" and to "the common areas" of the building; and "continually ignoring [p]laintiffs' repeated requests to cure the nuisance created by the smoking and infiltration of secondhand and thirdhand marijuana and tobacco smoke to [p]laintiffs' Unit and common areas" of the building.

¶ 11    The parties conducted discovery. On March 30, 2022, four-and-a-half years after the case was initiated, the court entered an order providing that fact discovery would close April 28, 2022. Plaintiffs were also ordered to answer "Rule 213(f) Interrogatories and disclose trial and expert witnesses by April 28, 2022."

¶ 12    On April 28, 2022, plaintiffs filed a motion to extend the fact discovery deadline. They alleged that they had "recently found a small number of additional documents responsive to Defendants' request for documents," and that they had supplemented their production that day.

Plaintiffs alleged that the documents consisted of email communications between plaintiffs and Jody Sarich, a Board member and chairperson of the Safety and Security Committee at the Association, and requested a two-week extension of the fact discovery deadline to conduct a deposition of Sarich.

¶ 13    On May 12, 2022, after a hearing, the trial court entered a written order granting plaintiffs' motion to extend fact discovery until June 3, 2022. The written order further indicates that "[p]laintiffs' oral motion to extend the date to provide Rule 213(f)(3) [controlled expert witness] disclosures " was denied. No transcript from that hearing is contained in the record on appeal.

¶ 14    On June 17, 2022, the Association, Dress, and plaintiffs each filed a motion for summary judgment.

¶ 15    The Association argued that summary judgment was warranted because plaintiffs' breach of fiduciary duty claim was "premised on the assertion that smoke infiltrated their unit to an extent that would constitute a nuisance to an ordinary, reasonable person." The Association contended that plaintiffs had not disclosed any expert witness who could testify that smoke had infiltrated plaintiffs' unit. The Association further asserted that, to determine whether a particular annoyance constitutes a nuisance, the court must consider the effect of the annoyance on an ordinary, reasonable person, rather than the effect on a person who is abnormally sensitive. The Association argued that plaintiffs "lack[ed] any evidence that smoke is infiltrating their unit to a level that would constitute a nuisance to an ordinary, reasonable person. No witness has been able to verify [p]laintiffs' subjective claims that they can smell smoke in their unit."

¶ 16    In the alternative, the Association argued that the business judgment rule precluded liability, because "the Association made immediate, repeated and diligent efforts to address the

alleged smoke smell in [p]laintiffs' unit, despite never being able to verify it," and there was "no evidence that the Association engaged in bad faith, fraud, illegality, or gross overreaching."

¶ 17    Finally, the Association argued that "[t]o constitute a nuisance, the act complained about must cause some injury, real and not fanciful," and there was no authority to support a conclusion that the "alleged smell of cigarette or marijuana smoke constitutes a nuisance to a reasonable person of ordinary sensibilities." As a result, the Association argued that plaintiffs could not "demonstrate that any nuisance exists, and they cannot establish that the Association breached any fiduciary duty to address a nuisance."

¶ 18    In Dress's motion for summary judgment, she asserted that summary judgment was proper because there was no evidence that Dress's unit was the source of any smoke that allegedly infiltrated plaintiffs' unit; there was no evidence of intentional, negligent, wrongful or unlawful conduct by Dress; and nuisance claims based on secondhand smoke exposure were not cognizable, and had been rejected by "courts across the country." Dress also contended that there was no evidence of "physical invasion" of plaintiffs' unit, and that plaintiffs could not recover the diminution in value of their unit and their interest in the common areas as damages where there was no evidence that the unit suffered any physical damage.

¶ 19    In plaintiffs' motion for summary judgment, they argued that the "documents, depositions, admissions and affidavits" established that the Association breached its fiduciary duties to plaintiffs by failing to thoroughly investigate their complaints, and "uniformly enforce the Rules and Regulations to ensure the smoker cured the nuisance." Plaintiffs also contended that the "documents, depositions, admissions and affidavits" established that Dress' actions constituted a private nuisance, in that they "invaded [plaintiffs'] interest in the use and enjoyment of [their unit], and were "substantial, either intentional or negligent, and unreasonable."

6

¶ 20    In support of their respective motions for summary judgment, the parties submitted various documents, including discovery answers and transcripts of various depositions, including those of Carey, Fry, Dress, and Phil Pritzker, General Manager at The Habitat Company.

¶ 21    Pritzker testified as to the general process by which the Association investigates and enforces rule violations, and the alleged violations at issue. He testified that when a resident complains of a violation of the Rules and Regulations, management will visit the unit implicated and attempt to independently verify that a violation has occurred. If the violation is verified, security staff will then prepare an incident report, and any such reports are forwarded to Pritzker weekly. Pritzker further stated that, in the event of a repeat violation by a resident, he will share the incident report with the Board, which has a hearing committee that will then decide whether to conduct a hearing involving the alleged violator.

¶ 22    As to the specific alleged rule violations in this case, the documents submitted in support of the summary judgment motions establish that plaintiffs' complaints of smoke in their unit began sometime in 2015. Pritzker testified that plaintiffs first directed their complaints at a different neighboring unit, Unit 3711. Both maintenance staff, and Pritzker himself, spoke to the residents of that unit, but the Association was unable to verify that any smoke was infiltrating plaintiffs' unit.

¶ 23    On February 13, 2015, Carey sent an email to Pritzker and others at the Habitat Company, thanking them for their "effort and time regarding the smoke issues," and expressing that she was "not surprised" that they had been "unable to detect lingering smoke or aromas."

¶ 24    Following Carey's February 13, 2015, email, plaintiffs continued to complain of smoke infiltration into their unit. Due to the "continuing concern expressed by" plaintiffs, representatives of the management company then went into Unit 3711, and "investigate[d] the hole, the outlets

and the pipes that connected the two unit[s]," and Pritzker "authorized the sealing of those two areas, the pipes going in through the walls and the outlets, just as a precaution."

¶ 25    Pritzker then stated that, "sometime after that," plaintiffs began complaining that the smoke may have been coming from Unit 3703, on the other side of plaintiffs' unit. Pritzker testified that the Association then

> "did the same thing. We had spoken with that owner [Dress], and even though there was an expression shared that there was—she was not continually smoking at that time, or not smoking at all anymore, she did allow us into her unit to also examine the pipes that connect the two units as well as outlets on the demising wall."

¶ 26    The record contains conflicting information as to whether the maintenance workers then performed work on Dress's unit. Pritzker testified that the same remediation work that was completed in Unit 3711 was completed in Dress's unit, however Dress stated that an engineer visited her unit to inspect it, concluded that there was no problem, and did not seal any openings.

¶ 27    Pritzker could not remember if the same remediation work was done in plaintiffs' unit, although he was confident that it was offered to them. In Fry's deposition, he confirmed that maintenance workers "did some patching work" using an expandable aerosol foam to fill open areas around the pipes inside plaintiffs' unit.

¶ 28    At some point in 2015, the residents of Unit 3711 moved out, leaving Unit 3703 as the only occupied unit adjoining plaintiffs' unit. Pritzker confirmed, however, that The Habitat Company was never able to verify that any smoke was emitting from Dress's Unit 3703, and accordingly, Dress was never notified that she had violated the Association's Rules and Regulations.

¶ 29    On December 11, 2015, after plaintiffs continued to complain of smoke, The Habitat Company sent a letter to building residents, on behalf of the Board, explaining that there had been

continuing complaints of the smell of smoke, and requesting that smokers purchase and use a charcoal filtered air purifying system to mitigate the smell.

¶ 30    Thereafter, in January 2016, Pritzker and Diane White, The Habitat Company's Vice President and Pritzker's supervisor, met with Carey regarding her concerns about smoking in the building. In her deposition, Carey acknowledged that she sent a follow up email on January 11, 2016, in which she thanked Pritzker and White for their "consistent attention, ongoing dialogue, and relational effort."

¶ 31    The next day, White responded to Carey's email. In her email, White remarked that Carey had expressed concern that The Habitat Company had not strongly recommended to the Board that the building convert to a smoke-free building. White explained that The Habitat Company could not unilaterally make decisions without the Board's consent. White informed Carey that The Habitat Company had contacted another association to acquire information on the process of converting to a smoke-free building, and that the company was planning to survey the building's residents to obtain their opinions on smoking in the units of the building. White advised Carey that both the results of the survey and the information obtained from the other association would be shared with the Board.

¶ 32    Sometime thereafter, The Habitat Company distributed a survey to all building residents. The survey, in part, solicited feedback concerning the residents' interest in converting into a smoke-free building. The survey results show that 36 percent of the residents responded to the survey, and 55 percent of those respondents were in favor of a ban on smoking in the units. After receiving the survey results, Pritzker prepared a document entitled "Survey Commentary," in which he stated that "management [wa]s not currently planning to recommend to the board any major changes" based on the survey results. In his testimony, Pritzker explained that because only

9

36 percent of the residents responded to the survey, it was "less than *** 21 or 22 percent" of the total residents who expressed an interest in banning smoking in the units when the survey results were extrapolated to the building as a whole. Pritzker stated his belief "that a 36 percent response rate is not an overwhelming response rate in which to make *** significant, very significant recommendations as far as board management," and while there were some "strident views" expressed on smoking in the building, Pritzker believed that "if there was such an overwhelming concern for this change to be made, then there should have been much heavier turnout on the survey."

¶ 33    In Jody Sarich's deposition, she testified that she is an owner and resident in the building. She is also a member of the Board and chaired the Safety & Security Committee. Sarich testified that the Committee would hold "Safety & Security Forums," where she and other Board members, along with a representative from the building security company, would hold meetings "for people to come and be able to speak to any of us directly." Sarich testified that the forums would address various issues, including fire safety, building evacuations, garage safety, and crime. "[A]s a single [B]oard member," her role was not to "instantly solve [any issues] on the spot," but she would "directly relay them to the *** leadership," including, particularly Pritzker from the building's management company, who could "investigat[e] if there is something they can do to relieve [the residents'] concerns."

¶ 34    Sarich remembered that "[i]ssues of smoking certainly have come up," in particular, "asking for smoking to be banned in the whole building." Those conversations would "typically revolve around explaining the process that needs to happen in order for that to happen in [the] building, because it [was] not something that [Sarich] or the Board alone can effectuate just on [their] own."

¶ 35     Although Sarich's committee was not "formally involved in grievance complaints," Sarich testified that she was familiar with the grievance and hearing procedure. Sarich confirmed that when residents lodged a complaint, it would be "directed to the management company to begin a process of evaluating and investigating that complaint." The management company would "independently investigate what's happened," because the Association should not be "accus[ing] people based on an accusation." If the management company came to the conclusion that there had been a rule violation, the evidence to support the violation "would be referred to the Hearing Committee," which would then hold a hearing to "allow[ ] the accused person to come and meet with" the Committee and explain or defend themselves. The Hearing Committee would collect information and make a recommendation to the Board, which decided as a whole whether there was a violation and what the consequences should be.

¶ 36     During her deposition, Carey testified that she had lived in Unit 3701 "off and on" since 2006, and that she owns another residence in New York. Carey stated that she had never seen smoke in her unit, but had smelled it in her kitchen, in the hallway, and on the balcony. Carey stated that in 2019, her neighbor, Dress, had a young man living with her for a year, and during that time she smelled smoke "everyday." At that time, Carey also saw a group of young people smoking marijuana and cigarettes on Dress's balcony more than 25 times.

¶ 37     Carey believed that Dress's unit was the source of smoke in her unit, because the residents of Unit 3711 had moved out in 2015, and no one lived in the floor above and below plaintiffs' Unit. Carey did not know if anyone occupied the Unit above or below Unit 3711. Carey stated that, after the residents in Unit 3711 moved out, smoke would enter the cabinets of her kitchen, and that she could smell smoke in the area above her stove and in her living room, which shares a wall with Dress's unit.

¶ 38    Carey stated that she also smelled smoke when Dress was alone in the unit. Carey stated that Dress told her directly that she smokes several cigarettes per day. However, she could not remember when the conversation occurred, whether it was "a year ago, three years ago, or five years ago." Carey testified that she saw Dress smoking on one occasion, when Dress was on her balcony with her sister. Carey believed they were "sharing a cigarette" because Carey could "see some hand gesture[s] back and forth" and "some smoke." Carey acknowledged that Dress's back was facing Carey, and she did not see a cigarette in Dress's hand. Carey also agreed that this incident was the only time she had ever seen Dress smoking.

¶ 39    Carey further stated that she believes that The Habitat Company and the Association protect Dress, who works as a realtor and has an office in the building. Carey testified that communication between the parties ceased after the email in which White informed her that The Habitat Company could only act as permitted by the Board.

¶ 40    Carey further testified that many years prior, she had undergone a thoracotomy, which she described as a medical procedure in which part of her lung was removed, because she had a "nodule that was active going towards being cancer." Carey stated that she consulted Dr. James Walter, once, in March 2015 because she was concerned about her coughing and feared that her symptoms might be "a precursor to a pulmonary nodule." She requested that Dr. Walter write a letter. That letter indicated that at the visit, Carey

> "described symptoms of chest congestion, a dry cough, and watery eyes that have been present since heavy smokers moved into apartments on either side of her current residence.
>
> Given the known deleterious effects of second hand smoke exposure and the temporal association between the onset of her symptoms and the new exposure

to cig[a]rette smoke, her pulmonary symptoms are likely related to her proximity to heavy smokers.

If possible, she would benefit from any efforts that reduce the amount of smoking done in the area around her apartment."

¶ 41    Carey testified that Dr. Walter did not diagnose her with any condition as a result of the smoke infiltration. Other than Dr. Walter, Carey had not seen any other doctor or medical provider for complaints of injuries arising out of smoke infiltration.

¶ 42    During his deposition, Fry confirmed that he and Carey currently live in New York in a single family detached house, and that they would not move to Chicago, because Unit 3701 "would be a considerable downsizing." Fry explained that Unit 3701 is about "700-or-so square feet," and plaintiffs own "too many square feet of possessions and equipment." It "would be impractical" for them to live in the Chicago unit as a single residence.

¶ 43    Fry testified to his understanding that the building rules provided that "smoking is permitted both within the walls of the condo and within the perimeter of the balcony" so long as it did not cause a nuisance or unreasonable disturbance. Fry testified that he never saw Dress smoking. He had a "faint" recollection of Carey "describ[ing] [Dress] and her sister on the balcony," but he testified that "the smoking was not a concern then." Fry testified that he could not "explain why" smoking was not a concern previously.  He believed, however, that the building underwent heating and ventilation work in 2015, which "exacerbated problems" of smoke infiltration into their unit.

¶ 44    Fry stated that when they were visiting the Chicago unit, he would smell smoke in the unit every few days, and would smell tobacco and marijuana in the hallway. When asked whether there

were any particular occasions that were "usual or unacceptable," Fry responded "[i]t doesn't take much to make [smoking] unacceptable as far as I'm concerned."

¶ 45 Fry testified that he would smell smoke mostly in the kitchen and cabinets of his unit. From 2019 to 2020, Fry saw people throwing "roaches" off of Dress's balcony, as well as smoking marijuana and cigarettes on the balcony. Fry described two specific times when he saw people smoking marijuana on the balcony, and asserted that he saw this activity on Dress's balcony five to seven other times, at "all sorts of times."

¶ 46 Fry acknowledged that they had previously had three security cameras on their balcony. Two of the cameras had stopped working, and Fry "moved the last of the functioning equipment so that it's primarily over in the direction of Helen Dress's unit" because the "apparent [smoking] problem from Dress's unit was not a problem from the balcony on the right."

¶ 47 Fry believed that there may have been an email in which The Habitat Company proposed purchasing a charcoal filter for plaintiffs to use in their Unit. Fry asserted, however, his belief that a filter should "be applied at the source of the pollution, not in our unit, for example."

¶ 48 Fry further testified that plaintiffs had engaged James Repace to investigate and test their unit, and that Fry purchased and placed air monitors in the unit for Mr. Repace's analysis. Fry also testified that he asked personnel from Titan Security, the company who provides security services for the building, to visit the unit between six to eight times. When asked about the details of those events, and whether those personnel had smelled smoke, Fry deferred to his wife, saying she "would be better at answering" the questions. Fry explained that he never personally heard any personnel from Titan Security say that they smelled smoke, because they often visited "in the middle of the night and [Fry] just sort of hid under the covers." Fry never received a report from Titan Security. Additionally, Fry stated that "Public Health and Safety" had suggested an

14

"advanced indoor air quality evaluation," but that plaintiffs did not have that evaluation performed because it was estimated to cost between $1,000 and $5,000.

¶ 49    In Dress's responses to plaintiffs' discovery requests, she stated that, prior to quitting in 2013, she occasionally smoked tobacco in her unit or on her balcony. Dress stated that she has never smoked marijuana in her unit. She also stated that the only person who has stayed with her who smoked tobacco is her sister, who visits Dress around once per year, living in Dress's unit for "a little over a month." During these visits, her sister "periodically" smokes tobacco on her balcony, but no one had ever smoked marijuana in her unit.

¶ 50    During her deposition, Dress stated that, whenever there was an overnight guest in her unit, she was also present in the unit. Dress stated that, in 2018, she was ill and her friend's son, William, stayed with her for almost an entire school year. Dress confirmed that two photographs shown to her depicted William on her balcony. She agreed that it looked like he was smoking a cigarette, and that he had a key to her unit and permission to come to her unit at any time. In one other photograph, Dress identified William's brother, James, on the balcony. Dress believed that it looked like he was vaping. Five photographs, most or all of which are timestamped "snapshots" from plaintiffs' security camera, and which appear to depict individuals smoking on a balcony, are included in the record on appeal.

¶ 51    Along with the summary judgment motions, both the Association and Dress filed separate motions to strike certain evidence. Specifically, in plaintiffs' motion for summary judgment, they referenced and attached a report by James Repace of Repace Associates, dated February 1, 2017. Carey stated in an affidavit that she had retained Repace Associates "to provide passive nicotine monitors to assess the secondhand smoke concentration in the Unit." Plaintiffs also attached an August 10, 2018, email from James Repace, stating "your results are still positive for nicotine,"

15

showing a purported nicotine level of 0.0001 "ug." The Association and Dress also sought to strike certain photographs, plaintiffs' lay opinion testimony, consultants' invoices, evidence relative to Titan Security, and a letter drafted by plaintiffs' former attorney.

¶ 52    In the Association's and Dress's motions to strike, they explained that plaintiffs had made an oral motion to extend the discovery deadline to disclose expert witnesses, which had been denied. Despite the court's denial, plaintiffs purported to rely on the attached expert reports and opinions in support of their summary judgment motion. The Association and Dress asserted that they had not had the opportunity to depose plaintiffs' purported experts, because plaintiffs failed to comply with this Court's order and with Rule 213(f), and plaintiffs had not indicated that they would be relying on these purported experts' opinions or testimony at trial. The Association and Dress argued that they would be severely prejudiced if plaintiffs were allowed to rely on the purported experts' opinions, since the deadline for deposing them has passed. Alternatively, the Association and Dress asserted that the reports were otherwise inadmissible.

¶ 53    In its response to the motions to strike, plaintiffs asserted that they were not required to disclose the authors of the reports as expert witnesses under Rule 213(f), because they were "not offering the reports for the truth of the matters asserted," meaning that they were "not seeking to prove the secondhand smoke infiltration or concentration in [p]laintiffs' unit." Instead, plaintiffs contended that they "attach[ed] the reports as exhibits to their affidavits to demonstrate the extraordinary effort and expense [p]laintiffs had to endure to get the Association to take [p]laintiffs' complaints seriously, and to support the assertion that the Association breached its fiduciary duty warranting summary judgment in [p]laintiffs' favor."

¶ 54    On September 21, 2022, the trial court held a hearing on the motions for summary judgment, and motions to strike. The parties initially discussed the motion to strike, with plaintiffs

16

again maintaining that they "should be allowed to bring that evidence, *** not for the truth of the matter asserted in [the reports] *** [but as] circumstantial evidence *** [t]o prove breach" of the Association's fiduciary duty. After hearing arguments from the parties, the trial court ordered that the "expert reports are barred as a sanction for violation of the Court's order with respect to discovery; and therefore, the plaintiff is barred from presenting those reports as expert opinion testimony. To the extent that the reports can be used for some other purpose, ruling is reserved."

¶ 55    The court then turned to the motions for summary judgment.

¶ 56    Counsel for plaintiffs argued that the "history of the communications between Phil Pritzker" and plaintiffs made clear that the building "policies *** were not uniformly applied." Counsel further asserted that Pritzker gave "deference" to Dress's claim that she did not smoke "because he kn[ew] her" as a realtor in the building. Counsel also asserted that they had "several examples of how the board addressed other smoking complaints," which showed that the Board handled their complaints differently. Counsel stated that those notices of violation indicated that the matter was proceeding to a hearing, however, regarding plaintiffs' complaints, the Association "[n]ever had a hearing to address those concerns." Counsel further argued that "Dress admitted she smoked. She's pointed out other people smoking on the balcony. She's admitted that her sister smokes when she comes over. There are ashtrays on the balcony."

¶ 57    As to plaintiffs' claims against Dress, the court asked counsel how it could rule in favor of plaintiffs without a trial.  Counsel for plaintiffs responded,

> "Because there's no genuine issue of material fact that *** Dress was the source of the smoke. I mean, she can say what she wants, but she also committed perjury and said she didn't smoke. *** I know you can't weigh credibility, Judge, but you can

17

take the papers and you can look at the papers and see what the *** mountain of the evidence is. It clearly establishes that she's the source of the smoke."

¶ 58    Counsel for the Association argued that

"by not issuing a notice of violation against Helen Dress, [the Association] was enforcing its policies correctly and even-handedly. And in spite of the fact that it wasn't able to independently verify the plaintiffs' complaints, the [A]ssociation did take a long list of actions to try to address those complaints.

***

As far as the plaintiffs' complaints, they were thoroughly investigated. The property management company sent the general manager himself. They met with plaintiffs numerous times. They sent maintenance. They sealed openings in the plaintiffs' unit. In spite of the lack of independent verification, they took many, many steps to address plaintiffs' complaint[s]."

¶ 59    As to plaintiffs arguments that other complaints of smoking were handled differently, counsel for the Association stated that there was "no evidence that these people were issued notices of violation in the absence of any independent verification."

¶ 60    The court then posited:

"I don't think any jury's going to believe Ms. Dress wasn't smoking and smoke was coming through the units. Now, [t]hat's not the question really before me. The question before me is to address whether or not the board breached the rules and regulations of their fiduciary duty to the plaintiffs."

¶ 61    The court then turned to counsel for Dress. Counsel first addressed the court's observation that the evidence showed that Dress smoked. Counsel explained that Dress "hasn't smoked tobacco

18

since 2013. *** She hasn't smoked since 2013 [to] the present day let alone in her unit." Counsel stated that she "t[ook] great umbrage with plaintiffs' counsel's characterization that his clients have seen my client smoking." Counsel explained that the only evidence that plaintiffs "observed" Dress smoking involved an incident when Dress was on the balcony with her sister, who Dress acknowledged would occasionally smoke on the balcony when she visits. Regarding plaintiffs' testimony that Dress "has told [plaintiffs] directly that she's a smoker," counsel noted that Carey did not have any "recollect[ion] when [Dress] told her this." Counsel stated that Dress "d[id] not dispute that [she] used to be a smoker and then if plaintiff happened to ask Defendant Dress prior in 2013 if she smoked, obviously the answer would have been yes."

¶ 62    Counsel further argued that plaintiffs' claims that Dress's unit was the source of any alleged smoke was purely speculative.

> "[P]laintiffs have just sort of come to the conclusion that Defendant Dress's unit is the unit that this smoke is emanating from. Plaintiffs spend 80 percent of their year in New York. They're relying on seven still photographs they've taken from security camera on their balcony of people at seven different times smoking on our client's balcony. They don't have any evidence that her unit is the cause of any smoke infiltration into their unit. *** [T]here's nowhere in evidence or attached to any of these motions or in any testimony tending to show which units on that floor are smoking units and who on that floor is smoking."

¶ 63    That same day, the court entered a written order. The court "granted in part and denied in part" the Association's and Dress's motions to strike. It explained that the motions were "granted in that Plaintiffs' expert reports are barred from being offered for the truth of the matters asserted as a discovery sanction. The Court reserves ruling with regard to the use of the reports for other

purposes." The trial court then took the motions for summary judgment under advisement, for ruling at a later date.

¶ 64 On January 25, 2023, the trial court entered an 18-page order on the parties' respective motions for summary judgment and motions to strike.

¶ 65 Regarding the motions to strike, the court reiterated that there was "no evidence that, following this lawsuit being instituted, Plaintiffs ever disclosed their purported expert evidence by the deadline originally imposed by this Court, in compliance with Rule 213(f)," and that "Plaintiffs' purported expert evidence is stricken."

¶ 66 Turning to the summary judgment motions, the court initially found that the Association owed plaintiffs a fiduciary duty to address complaints of smoke infiltration, and enforce rules related to smoking. Plaintiffs, however, could not show that the Association breached those duties where they failed to show that smoke was infiltrating their unit to a level that would constitute a nuisance to an ordinary, reasonable person. The court noted that "The Rules and Regulations do not define the term 'unreasonable,' " and found that the plain meaning "suggests that the measure of whether a smoking-related disturbance is 'unreasonable' is objective, rather than subjective, in nature."

¶ 67 The court explained that the only evidence plaintiffs offered to support their claim that smoke was infiltrating their unit was their respective deposition testimony, in which they testified that they smelled smoke within areas of their unit and in common areas, and that they observed Dress and guests smoking on the balcony of Dress's unit.

¶ 68 The court explained, however, that plaintiffs' deposition testimony

> "only shows their subjective belief that smoke is infiltrating their unit, that the
> smoke is originating from Ms. Dress's unit, and that the infiltration is of such a

level so as to constitute a disturbance that is unacceptable or clearly inappropriate, excessive, or harmful. However, Plaintiffs do not offer evidence beyond these subjective beliefs, to support their assertions."

¶ 69    The court noted that there was a suggestion that representatives from "Titan Security" visited plaintiffs' unit and smelled smoke, but plaintiffs did not have a report from the company, identify the names of the Titan Security agents who purportedly smelled the smoke, and did not depose said agents during discovery. The court also noted that plaintiffs had not provided "a diagnosis from a licensed medical physician concluding that Plaintiffs experienced physical ailments from smoke exposure." Without anything other than plaintiffs' subjective observations, the court "[wa]s unable to find, as a matter of law, that smoke infiltrated their unit in violation of Rule 42 of the Rules and Regulations," and accordingly, the Association did not "breach their fiduciary duties by failing to remedy the smoke infiltration *** , or to require Ms. Dress to remedy her alleged nuisance."

¶ 70    The court also pointed out that in their depositions, Pritzker and Dress testified about the efforts taken by the Association to address plaintiffs' complaints, but that the complaints were never able to be verified. The court noted that plaintiffs did not dispute "that the Association expressed that it was unable to verify smoke infiltration into their unit, or that an engineer examined Ms. Dress's unit and concluded that there was no perceived problem relating to the alleged infiltration." Instead, "[p]laintiffs seem to assert that the Association was unable to verify the alleged smoke infiltration only because its efforts in investigating the infiltration were subpar." The court concluded, however, that plaintiffs did not present any evidence showing that the Association "was required to investigate at a higher level than it did."

¶ 71 Finally, the court explained that plaintiffs did not provide any evidence that other complaints were handled differently than their own. Accordingly, the court found that plaintiffs' breach of fiduciary duties claim against the Association "fail[ed] as a matter of law" because plaintiffs could not "show that the alleged smoke infiltration would constitute a material annoyance to a reasonable person."

¶ 72 Finally, the court explained that the Association had presented alternative arguments to support summary judgment, in particular that the business judgment rule precluded liability for the Association's alleged conduct. However, in light of the court's conclusions summarized above, the court chose not to address those alternative arguments.

¶ 73 The court next addressed plaintiffs' claim of private nuisance against Dress. The court explained that it had "already found in relation to Count I *** [that] Plaintiffs are unable to successfully show that smoke infiltrated their unit," and, without additional evidence, "it remains merely speculative whether the smoke generated by the alleged conduct" of Dress or her visitors "was indeed the same smoke that [p]laintiffs believe infiltrated their unit." Accordingly, the court found "that [p]laintiffs fail, as a matter of law, to prove an invasion into their unit caused by Ms. Dress, and their claim against her for private nuisance fails."

¶ 74 The court similarly declined to address Dress's alternative arguments for summary judgment, based on her contentions that

> "nuisance claims have been unsuccessful within other jurisdictions across the country; there is no evidence that she acted intentionally, negligently, or wrongfully to cause an invasion into [p]laintiffs' unit; and [p]laintiffs do not show that they have suffered a diminution in the value of their unit or of their interest in the common areas."

22

¶ 75    Based on the above, the court denied plaintiffs' motion for summary judgment, granted the Association's and Dress's motions for summary judgment.

¶ 76    Plaintiffs filed a timely notice of appeal from that order.

¶ 77    In this court, plaintiffs assert that the trial court incorrectly granted summary judgment for the Association and Dress, and that summary judgment should have been granted in their favor. As to their breach of fiduciary duty claim, they contend that the evidence before the trial court "firmly establishes the Association breached its fiduciary duty to [p]laintiffs." Regarding their private nuisance" claim against Dress, they allege that the evidence "establish[es] that smoke infiltrated [p]laintiffs' unit from Dress' unit," which "impact[ed] their health and wellbeing, and interferes with the use and enjoyment of their unit." Plaintiffs also contend that the trial court improperly granted the Association's and Dress's motions to strike.

¶ 78    We first address the trial court's order striking the purported expert evidence. In particular, plaintiffs sought to rely on expert reports from "Public Health & Safety" and Repace Associates, and an email from James Repace containing purported expert opinions.

¶ 79    The decision of whether to admit or exclude evidence, including whether to allow an expert to present certain opinions, rests solely within the discretion of the trial court and will not be disturbed absent a demonstrated abuse of discretion. *Cetera v. DiFilippo,* 404 Ill. App. 3d 20, 36–37 (2010). Moreover, "[a] trial court's decision whether to allow evidence that was not disclosed during pretrial discovery or whether to impose a discovery sanction" is also reviewed for an abuse of discretion. *Morrow v. Pappas*, 2017 IL App (3d) 160393, ¶ 27. An abuse of discretion occurs only if no reasonable person would take the view adopted by the trial court. *Foley v. Fletcher,* 361 Ill. App. 3d 39, 46 (2005).

23

¶ 80    Initially, we note that in the circuit court, plaintiffs maintained that it did not intend to rely on the proposed evidence "for the truth of the matter asserted," and instead, that the report and the attorney letter were admissible to show the "effort and expense Plaintiffs had to endure to get the Association to take Plaintiffs' complaints seriously." Again, in this court, plaintiffs contend that they did not "ask[ ] the circuit court to accept the facts set forth in those documents, but instead to take notice of *** them as an effort by Plaintiffs to prompt the Association to take their complaints seriously and issue Notices of Violation and conduct a hearing in the proper exercise of its fiduciary duty." They clarify that they "are not seeking to prove the secondhand smoke infiltration or concentration in [p]laintiffs' unit," and contend that they do not intend to use the report "for the truth of the matter," *i.e.*, to substantiate the existence of smoke in their unit. Instead, they assert that they rely on such evidence "to show the information the Association had and ignored."

¶ 81    First, plaintiffs provide no authority for their argument that they can seek the introduction of expert opinions—without having disclosed the authors of those opinions as expert witnesses—because they are not using the reports "for the truth of the matter." Absent any reasoned argument and citation to relevant authority, we could conclude that plaintiffs have forfeited this claim. Ill. Sup. Cr. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that briefs must contain "Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."); *Bank of America, N.A. v. Kulesza*, 2014 IL App (1st) 132075, ¶ 18 ("It is well settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Supreme Court Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal.").

¶ 82    Moreover, while claiming they are not relying on the reports for their truth, plaintiffs assert that the report provides evidence of "a snapshot in time of the conditions in [p]laintiffs' unit," and

they describe that report as showing, among other things, Mr. Repace's conclusions " 'within a reasonable degree of scientific certainty,' that 'secondhand smoke is present in [plaintiffs'] apartment;' [and] that [plaintiffs] are 'exposed' to secondhand smoke 'during their neighbor's smoking.' " Plaintiffs' arguments are also unavailing because they presuppose that the report's contents are true—that smoke existed in the Unit and in an amount that the Association was required to provide even more substantial remediation than was done.

¶ 83    Nevertheless, the court's order of September 21, 2022, essentially tracked plaintiffs' argument, granting the motions to strike and barring the expert report "from being offered for the truth of the matters asserted as a discovery sanction." The circuit court, however, "reserve[d] ruling with regard to the use of the reports for other purposes." Having asserted, in the trial court and in this court, that they did not intend to rely on the reports and expert opinions for their truth, plaintiffs cannot be heard to complain when the trial court barred them from being used for that purpose.

¶ 84    We acknowledge, however, that in the trial court's later order filed January 25, 2023, it reiterated its holding that "[p]laintiffs' purported expert evidence is stricken," this time without providing language limiting the decision to plaintiffs' use of the reports "for the truth of the matter." Based on this court's review of the record, it is unclear whether the court's January 2023 order striking the expert reports was still subject to the same limitations set forth in the prior order, or whether the order indicated the trial court's revised decision to strike the reports for all purposes. Nonetheless, even if the court's order granted the Association's and Dress's motions to strike the purported evidence for all purposes, we find no abuse of discretion in the trial court's decision.

¶ 85    Pursuant to Rule 213(f), "Upon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial." When that witness is a controlled expert witness, the party must identify: "(i) the subject matter on which the witness will testify; (ii) the

25

conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. Sup. Ct. R. 213(f)(3). Pursuant to Rule 213(g), "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial." Ill. Sup. Ct. R. 213(g).

¶ 86    The purpose of discovery rules governing the timely disclosure of expert witnesses, "is to avoid surprise and to discourage strategic gamesmanship" among the parties. (Internal quotation marks omitted) *Steele v. Provena Hospitals,* 2013 IL App (3d) 110374, ¶ 92.  Accordingly, "Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties." *Tirado*, 2019 IL App (1st) 181705, ¶ 48. "[I]f an opinion is important to the theory of one's case, it is essential that it and the bases [for it] be disclosed." *Id.* ¶ 49. "Disclosure of a retained expert witness' opinions and the basis for that opinion is a bright line rule and must be followed." (Internal quotation marks omitted.) *Morrisroe v. Pantano*, 2016 IL App (1st) 143605, ¶ 44. *Kubicheck v. Traina*, 2013 IL App (3d) 110157, ¶ 39 ("The discovery rules impose enforceable obligations upon the parties, including a duty to disclose relevant and discoverable information relating to their controlled expert witnesses. [Citation.] The failure to make such disclosures in a timely and complete fashion justifies sanctions against the parties, even if the failure is the result of actions taken or not taken by the controlled witnesses themselves."); see also *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 378 (2003) ("To allow either side to ignore the plain language of Rule 213 defeats its purpose and encourages tactical gamesmanship.")

¶ 87    "Where a party fails to comply with the provisions of Rule 213, a court should not hesitate sanctioning the party, as Rule 213 demands strict compliance." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 110 (2004). "In determining whether the exclusion of a witness is a proper sanction for

nondisclosure, a court must consider the following factors: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness." *Id.*

¶ 88 In their appellate brief, plaintiffs briefly contend that they did in fact provide a discovery response "follow[ing] the letter of Rule 213(f) and identify[ing] Repace as an expert and detail[ing] the conclusions he arrived at 'to a reasonable degree of scientific certainty.' " Plaintiffs, however, provide no citation to the record for this discovery response. Based on our review of the record, we have found no document in which plaintiffs answered Rule 213(f) interrogatories, or otherwise disclosed the identities of any expert witnesses, the testimony they expected to elicit, or the basis for any opinion testimony.

¶ 89 Plaintiffs' contention that they did respond is also contrary to their statements at the hearing on the motions to strike. When asked by the court why they did not comply with the discovery order requiring them to disclose controlled expert witnesses, plaintiffs responded that it was "an oversight, " and "at the time, to be honest, [plaintiffs] were uncertain [as to whether they] were going to identify experts *** and what those experts would say."

¶ 90 Although plaintiffs had produced a copy of the Repace Associates report during fact discovery, they never disclosed that they would rely on the opinions in the report at trial, or that they would call anyone from Repace Associates to offer fact or opinion testimony. Accordingly, the Association and Dress contend that they were surprised by plaintiffs' reliance on the purported expert reports, since plaintiffs had allowed the trial court's deadline to disclose expert witnesses to pass without any disclosure. And based on plaintiffs' nondisclosure, the Association and Dress did not depose any representatives of Repace Associates. In such circumstances, the Association

27

and Dress would be prejudiced in their ability to contest the reports, because the authors of these reports were never disclosed or made available for depositions in compliance with the court's order.

¶ 91    The record also shows that the Association and Dress promptly objected to the introduction of this evidence as exhibits to their motion for summary judgment.

¶ 92    Finally, regarding plaintiffs' diligence and good faith, plaintiffs have provided no explanation, in either the trial court or this court, for their failure to disclose the expert opinions, other than it being "an oversight." And as noted above, the record shows that, two weeks after the deadline passed, plaintiffs apparently made an oral motion to extend the deadline for witness disclosures. That motion was denied in a May 12, 2022, order, almost five years after this case was initially filed, and plaintiffs do not challenge that order on appeal. Moreover, because the motion was made orally at the hearing, and no transcript of that hearing is included in the record on appeal, this court does not know what arguments were presented to the trial court in favor of, or against, extending the deadline for expert witness disclosures, or the basis of its ruling. Accordingly, absent a record on which to review that order we "presume[ ] that the order entered by the trial court" denying plaintiffs' request to extend the deadline for expert witness disclosures was "in conformity with law and had a sufficient factual basis." *Foutch,* 99 Ill. 2d at 392. Where, as here, the trial court already heard, and denied, plaintiffs' request to extend the discovery deadlines, on a basis which we presume to be sufficient and proper (*id.*,) such circumstances also weigh in favor of the trial court's later decision to bar that evidence.

¶ 93    Finally, plaintiffs apparently argue that the court's consideration of the Association and Dress's motions to strike was premature, alleging that Rule 213(g) does not apply at the summary judgment stage, and it only limits expert opinions at trial. It is clear, however, that "[e]vidence that

28

would be inadmissible at trial is not admissible in support of or in opposition to a motion for summary judgment." *Complete Conference Coordinators, Inc. v. Kumon North America, Inc.*, 394 Ill. App. 3d 105, 108 (2009). Accordingly, it was proper for the trial court to consider whether the purported expert reports were admissible when considering whether summary judgment was appropriate. *Id.*

¶ 94    Based on the record, we find no abuse of discretion in the trial court's decision to bar the expert opinions on which plaintiffs proposed to rely, for plaintiffs' failure to disclose them. In light of that conclusion, we need not consider the alternative arguments posed by the Association and Dress regarding why the evidence was otherwise inadmissible.

¶ 95    We now turn to the parties' respective motions for summary judgment.

¶ 96    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). To determine whether there is a genuine issue of material fact, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *MEP Construction, LLC v. Truco MP, LLC*, 2019 IL App (1st) 180539, ¶ 12 (citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 131-32 (1992)). If reasonable people would draw divergent inferences from undisputed facts, summary judgment is inappropriate. *Id.* (citing *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)). The purpose of summary judgment is not to try an issue of fact, but rather to determine whether a triable issue of fact exists. *Robidoux v. Oliphant,* 201 Ill.2d 324, 335 (2002).

¶ 97    "A defendant moving for summary judgment may meet its initial burden of proof by affirmatively showing that some element of the case must be resolved in his favor or by

establishing that there is an absence of evidence to support the nonmoving party's case." *Freedberg v. Ohio Nat. Ins. Co.*, 2012 IL App (1st) 110938, ¶ 25. "Although a plaintiff is not required to prove his case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). Put differently, "[i]f the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is appropriate." *Lewis*, 2020 IL 124107, ¶ 15.

¶ 98   We review the granting of summary judgment *de novo,* meaning we perform the same analysis that the circuit court performed. *Outboard Marine*, 154 Ill. 2d at 102; *Bowman v. Chicago Park District,* 2014 IL App (1st) 132122, ¶ 45. Finally, we review the judgment, not the reasoning, of the circuit court, and we may affirm on any grounds in the record, regardless of whether the court relied on those grounds or whether its reasoning was correct. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).

¶ 99   Where, like here, the parties file cross-motions for summary judgment, they agree that no material questions of fact existed and they invite the court to decide the issue based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Nonetheless, the mere filing of cross-motions for summary judgment does not conclusively establish that there is no issue of material fact, nor is the circuit court obligated to enter summary judgment for either party. *Id.*

¶ 100   Plaintiffs first contend that the trial court erred in granting summary judgment in favor of the Association on their breach of fiduciary duty claim.

¶ 101   As an initial matter, plaintiffs briefly contend in their appellate briefs that this court should strike the deposition testimonies of Pritzker and Dress. They claim that "Pritzker's testimony generally" should be stricken because his claims that he could not independently verify plaintiffs'

complaints were "made without any supportive evidence." And similarly, they assert that "Dress only offers self-serving and conclusory deposition testimony" which should not be considered." Plaintiffs did not ask the trial court to strike their deposition testimony, and they provide no authority which would allow this court to do so. Accordingly, plaintiffs' argument is waived. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 306 (2000) ("Issues raised for the first time on appeal are waived.").

¶ 102   To state a cause of action for a breach of fiduciary duty, a plaintiff must allege (1) a fiduciary duty on the part of the defendant, (2) a breach of that duty, (3) damages, and (4) a proximate cause between the breach and the damages. *Feliciano v. Geneva Terrace Estates Homeowners Ass'n*, 2014 IL App (1st) 130269, ¶ 35; *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011) ("To recover for breach of a fiduciary duty, a plaintiff must prove that a fiduciary duty exists, that the fiduciary duty was breached, and that the breach proximately caused the injury of which the plaintiff complains.").

¶ 103   The Condominium Property Act (765 ILCS 605/1 *et seq.* (West 2014)) regulates the operation of condominium associations (*Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2014 IL App (1st) 111290, ¶ 51) and provides that individual members of the board of a condominium association owe a fiduciary duty to the unit owners ((765 ILCS 605/18.4 (West 2014); *Wolinsky v. Kadison,* 114 Ill. App. 3d 527, 533 (1983)). A condominium association may enact and amend rules and regulations covering the details of the operation and use of the property, and such rules must be objective, evenhanded, nondiscriminatory, and applied uniformly. *Board of Directors of 175 East Delaware Place Homeowners Ass'n v. Hinojosa,* 287 Ill. App. 3d 886, 890-91 (1997) (citing 765 ILCS 605/18.4(h) (West 1994)). In performing their duties, "the officers and members of the board *** shall exercise the care required of a fiduciary of the unit owners." (765 ILCS

605/18.4 (West 2014).; *Palm*, 2014 IL App (1st) 111290, ¶ 94. The Board and its members must "act in a manner reasonably related to the exercise of that duty, and the failure to do so will result in liability for the board and its individual members." *Palm*, 2014 IL App (1st) 111290, ¶ 111.

¶ 104   In this case, the plaintiffs claim, and the Association does not dispute, that it owed a fiduciary duty to the plaintiffs. What is in dispute, however, is whether defendants breached that duty.

¶ 105   As stated above, section 42 of the building's Rules and Regulations provide that "Smoking is permitted only in [u]nits, and only if it does not create a nuisance or unreasonable disturbance to others." Plaintiffs assert that the Association breached their fiduciary duty to adequately investigate and uniformly enforce that Rule, based on their complaints that Dress had violated it.

¶ 106   Plaintiffs' claim requires us to construe the language of section 42. "The construction of a contract is a question of law for the trial judge and is suitable for summary judgment." *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34 (1993). In contract construction, the primary objective is to give effect to the intentions of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). "[A] contract must be construed as a whole, viewing each part in light of the others." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson*, 241 Ill. 2d at 441.

¶ 107   Here, plaintiffs appear to argue only that the alleged smoke infiltration created an "unreasonable disturbance," contending that they are "not required to meet the legal definition of nuisance," because the rule applies to both.

32

¶ 108   The Rules and Regulations do not define the term "unreasonable." When a contract term is not defined, a court will "afford that term its plain, ordinary and popular meaning, *i.e.*, we look to its dictionary definition." *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 436 (2010).

¶ 109   Merriam-Webster Dictionary defines unreasonable as "beyond what can be accepted" and "clearly inappropriate, excessive, or harmful in degree or kind." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/unreasonable (last visited Mar. 20, 2024). Applying the definitions to the Rule at issue indicates that the Rule permits smoking, as long as it does not cause an "unacceptable" disturbance, or a disturbance which is "clearly inappropriate, excessive, or harmful." The trial court found, and we agree, that this interpretation suggests that the measure of whether a smoking related disturbance is unreasonable is objective, rather than subjective, in nature. See also *Zurich Insurance Co. v. Walsh Construction Co. of Illinois*, 352 Ill. App. 3d 504, 509 (2004) ("Reasonableness is an objective standard"); *Aetna Casualty & Surety Co. v. Dichtl*, 78 Ill. App. 3d 9706 (1979) ("In short an objective standard is governed by reasonableness; a subjective standard is governed by the actor's actual objective.").

¶ 110   Plaintiffs acknowledge that, "[u]ndeniably, [their] reports arise from a personal, subjective view of the impact smoke infiltration has on their health, well-being and ability to enjoy their unit." They contend, however, that there was objective evidence of unreasonableness because "Dress admitted she and others smoked in her unit and on the balcony," and they contend that her claim to have quit smoking in 2013 is "perjured."

¶ 111   Initially, plaintiff's argument mischaracterizes the evidence that was before the trial court. Dress maintained that she had quit smoking in 2013, and that she did not smoke in her unit at any point during the relevant time period of 2015 and after. Dress testified that she occasionally had visitors who smoked on her balcony, but that no one had smoked within Dress's unit.

¶ 112   In Carey's deposition, she asserted that Dress admitted that she smoked, but Carey did not have any memory of when that conversation happened. Plaintiffs also testified to certain occasions in which they saw visitors smoke on Dress's balcony, however, they never saw Dress, or anyone else, smoking inside Dress's unit. Carey testified that she believed she saw Dress smoking once, on her balcony, when her sister was visiting, but admitted that she did not see a cigarette in Dress's hand. She believed that Dress was sharing a cigarette with her sister, because Carey could "see some hand gesture back and forth" and she could "see some smoke."

¶ 113   Carey's vague observations do not rebut Dress's unambiguous testimony that she did not smoke in the relevant period. Without any timeframe for Dress's purported admission, it is possible that the conversation occurred in, or prior to, 2013, when Dress admits that she smoked. And the circumstances of Carey's observations of Dress and her sister on Dress's balcony make clear that Carey's characterization of Dress as "smoking," was mere speculation.

¶ 114   Plaintiffs, however, fault the court for "revers[ing] the course it took at oral argument," when it later ruled against them. Plaintiffs point to one comment from the court that it "d[id]n't think any jury's going to believe Ms. Dress wasn't smoking and smoke was coming through the units." Plaintiff's reliance on one isolated comment of the trial court as it considered the parties motions is not well-taken. Indeed, the court later explained to the parties that they should not read too much into comments made during the hearing, saying

> "these are questions that may sound like I'm making statements. These are questions as I work through I have not made a determination one way or the other on any of this, so don't be surprised if then you get the rule and it's totally different. This is how I ask questions and try to flush out the argument."

34

¶ 115   Our review of the record reveals that after the court's comment, counsel for Dress explained to the court the lack of evidence that Dress had smoked. And the trial court's subsequent written order clarifies its finding that there was no evidence showing that the smoke that plaintiffs claimed infiltrated their unit had originated from Dress's unit, or that the "infiltration is of such a level so as to constitute a disturbance that is unacceptable or clearly inappropriate, excessive, or harmful."

¶ 116   Nonetheless, the question is not whether Dress or her visitors smoked, or whether any amount of smoke, no matter how small, infiltrated into plaintiffs' unit. While the record undoubtably shows some instances during which visitors to Dress's unit smoked on her balcony, such evidence is not sufficient to show that such smoking was unreasonable. The Rules and Regulations provide that smoking is permitted in units of the building, and it is only prohibited if it creates "a nuisance or unreasonable disturbance to others." Such a policy cannot be read to prohibit any and all smoking in Units. Accordingly, the evidence that plaintiffs saw Dress's visitors smoking, or the handful of photographs submitted purporting to be visitors smoking on Dress's balcony over the course of several years, does not establish that such smoking created a nuisance or an unreasonable disturbance so that the Association could be required to take further actions on plaintiffs' complaints.

¶ 117   The record shows that plaintiffs have a strong subjective aversion to any amount of smoke, and would prefer to live in a smoke-free building. Carey took issue with the Association's efforts to investigate transitioning to a smoke-free building, and as Fry stated, "[i]t doesn't take much to make [smoking] unacceptable as far as I'm concerned." In plaintiffs' reply brief in this appeal, they take issue with the Association's failure to conduct a follow-up survey, when not enough residents responded to justify a change in building policies.

¶ 118   While we sympathize with Carey's health history and her desire to effect changes to the building policies, that fact remains that she and her husband own a Unit in a building which permits smoking. Plaintiffs' subjective belief that they should not be required to tolerate any amount of smoking in a multi-unit building which specifically permits it, does not make any amount of smoke objectively unreasonable.

¶ 119   Plaintiffs additionally contend that the evidence shows that the Association "failed to thoroughly investigate Plaintiffs' complaints." Plaintiffs also assert that the record shows that the Association "handled other smoking complaints far more thoroughly, and impartially, than [p]laintiffs' complaints."  We disagree, and find no evidence to support such conclusions.

¶ 120   Despite plaintiffs' displeasure with the outcome of the Association's investigation, the record shows that the Association undertook significant efforts to investigate and address plaintiffs' complaints. Pritzker met with the unit owners on both sides of plaintiffs' unit, arranged for inspections, and had maintenance workers seal open areas around the pipes. That remediation work was completed in plaintiffs' unit, and in Unit 3711.  In Dress's unit, the work was either completed, or determined to be unnecessary. Pritzker and others at the Association met and communicated with plaintiffs several times to hear their complaints. Carey at least initially believed those efforts to be satisfactory, sending emails thanking them for their "effort and time regarding the smoke issues," and their "consistent attention, ongoing dialogue, and relational effort." After plaintiffs' complaints persisted, the Association sent a letter to residents requesting that smokers use air purifiers to try to mitigate the smell, reached out to another association to learn about the process of becoming a smoke-free building, and sent a survey to all building residents to solicit interest in changing the rule to ban smoking in the units altogether.

¶ 121   Those "notices of violation" that plaintiffs rely on to argue that their complaints were handled differently do not indicate that they were sent without verification of the allegations. Plaintiffs seem to suggest that any and all grievances they made should have been immediately taken as true and proceeded to a hearing without the need for any verification. However, had the Association proceeded as plaintiffs request and issued Dress a Notice of Violation without independent verification, the Association would have been violating its own policies, possibly breaching its duty to Dress to uniformly enforce any alleged violations against her.

¶ 122   Particularly in light of the above significant efforts, the evidence in the record supports the conclusion that the Association acted in a manner reasonably related to the exercise of their fiduciary duty, and there is no evidence to support plaintiffs' claim that the Association breached a duty to plaintiffs to investigate their claims of smoke infiltration.

¶ 123   Because there is no evidence that would show that the Association breached its fiduciary duty to plaintiffs, summary judgment for the Association was proper. See *Lewis*, 2020 IL 124107, ¶ 15.  Accordingly, we need not analyze whether there was sufficient evidence to show damages or proximate cause, or whether any of the Association's additional arguments support the trial court's summary judgment, including whether the business judgment rule precludes any liability for the Association.

¶ 124   We next turn to plaintiffs' claim for private nuisance against Dress.

¶ 125   "A private nuisance is the substantial invasion of a person's interest in the use and enjoyment of his property." *Whipple v. Village of North Utica*, 2017 IL App (3d) 150547, ¶ 45. The invasion must be unreasonable and either intentional or negligent. *Id.* Whether particular conduct constitutes a nuisance is determined by the conduct's effect on a reasonable person (*In re Chicago Flood Litigation*, 176 Ill. 2d 179, 204 (1997)) and does not take into account any special

37

sensitivities the complaining landowner may have. (*Carroll v. Hurst*, 103 Ill. App. 3d 984, 990 (1982)). See also *Statler v. Catalano,* 167 Ill. App. 3d 397, 403 (1988) ("The standard for determining if particular conduct is unreasonable is determined by the effect it would have on a normal person of ordinary habits and sensibilities."); *Schweihs v. Chase Home Finance, LLC*, 2015 IL App (1st) 140683, ¶ 42, *aff'd*, 2016 IL 120041, ¶ 42 ("[T]he crux of the tort of private nuisance is to remedy wrongful behavior that *substantially* interferes with the use and enjoyment of one's property. *** [Plaintiff's] argument not only distorts the meaning of a private nuisance, but equates any singular *de minimis* encroachment or trespass into a private nuisance." (Emphasis original.)); *Gardner v. Int'l Shoe Co.*, 386 Ill. 418, 427 (1944) ("In determining the question of a nuisance, the question of time, location, and all the circumstances should be taken into consideration. The general rule is that people who live in cities must submit to the annoyance of city life, where smells and odors are complained of as nuisances.")

¶ 126   This court has found no Illinois case in which a court has considered whether a private nuisance claim is cognizable where smoke emanates from a neighbor's unit in a building where smoking is permitted. Although we need not address this question to resolve this appeal, we note that courts in other jurisdictions have concluded that, generally, such conduct is insufficient to provide a basis for a claim of private nuisance. *Ewen v. Maccherone*, 927 N.Y.S.2d 274, 277 (App. Term 2011) ("the law of private nuisance would be stretched beyond its breaking point if we were to allow a means of recovering damages when a neighbor merely smokes inside his or her own apartment in a multiple dwelling building.  *** To the extent odors emanating from a smoker's apartment may generally be considered annoying and uncomfortable to reasonable or ordinary persons, they are but one of the annoyances one must endure in a multiple dwelling building."); *Schuman v. Greenbelt Homes, Inc.*, 212 Md.App. 451, 69 A.3d 512, 520 (2013) ("Because

[cooperative housing association]'s members were allowed to smoke at the time the contracts were signed (and still are), the mere act of smoking in one's unit or on one's patio is unlikely to be substantially and unreasonably offensive to any person at any time."); *Nuncio v. Rock Knoll Townhome Vill., Inc.*, 389 P.3d 370, 375 (2016) (concluding that there was no authority, and plaintiff could "show no set of facts entitling him to relief on his claims" that his condo building was "liable for smoke migrating from the [neighbor's] private home into the common areas, [and] into [plaintiff's] outdoor patio area, or *** open windows.")

¶ 127   Nonetheless, because we concluded above that the record does not contain any evidence that smoke infiltrated plaintiffs' unit at a level that could be found to be unreasonable, plaintiffs' claim for private nuisance necessarily fails as well. *Whipple*, 2017 IL App (3d) 150547, ¶ 45 (to constitute a nuisance, the invasion must be unreasonable).

¶ 128   Moreover, although plaintiffs speculate that the smoke in their unit emanated from inside Dress's unit, speculation is not sufficient to defeat a motion for summary judgment. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 132 (1992) ("unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact"). Plaintiffs presented no competent evidence, from an expert or otherwise, that it was probable that the source of the smoke infiltrating their unit was caused by Dress or her visitors smoking within her unit. See *Majetich v. P.T. Ferro Construction Co.*, 389 Ill. App. 3d 220, 225 (2009) ("If plaintiff relies upon circumstantial evidence to establish proximate cause to defeat a motion for summary judgment, the circumstantial evidence must be of such a nature and so related as to make the conclusion more probable as opposed to merely possible."). It is axiomatic that mere guesswork or speculation is insufficient to create a genuine issue of material fact to survive a motion for summary judgment. *Judge-Zeit v. General Parking Corp.*, 376 Ill. App. 3d 573, 584

(2007) (citing *Tzakis*, 356 Ill. App. 3d at 747); *Sorce*, 309 Ill. App. 3d at 328. The only evidence in the record, other than plaintiffs' mere speculation, supports the conclusion that no smoking occurred in Dress's unit during the relevant time period. Dress testified that she did not smoke in her unit, and that her visitors did not smoke in her unit. And, as explained above, plaintiffs' vague observations and speculation of what was happening inside Dress's unit was insufficient to rebut Dress's testimony. Without any evidence, other than plaintiffs' mere speculation, that smoke was emanating from Dress's unit, summary judgment for Dress was proper.

¶ 129    The only evidence of smoking in the record indicates that visitors to Dress's unit occasionally smoked on her balcony. However, even if were to assume that some amount of smoke infiltrated plaintiffs' unit during those occasions, the evidence before the trial court showed approximately one incident of smoking every two months—the alleged offending conduct occurred over approximately seven years, and plaintiffs testified that they saw smoking on Dress's balcony approximately 35 times (Carey testified she saw people smoking on Dress's balcony at least 25 times, and Fry testified that he saw people smoking on Dress's balcony on 7 to 9 occasions). And despite admittedly setting up a security camera aimed at Dress's balcony, the record contains five photographs over the course of those seven years which purport to show someone smoking. In these circumstances, and because the building specifically permits smoking in units, we can find no evidence that Dress engaged in any "wrongful behavior" which "*substantially* interfere[d] with the use and enjoyment of [plaintiffs'] property. *Schweihs, LLC*, 2015 IL App (1st) 140683, ¶ 42. Accordingly, summary judgment for Dress was properly granted.

¶ 130    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 131    Affirmed.